### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| MARGARET A. MOSHER,            )<br>                                              )<br>    Plaintiff,                             )<br>                                              )<br>vs.                                          )<br>                                              )<br>THE ALARIS GROUP, INC., SARAH  )<br>GERHART, R.N., CATHOLIC MUTUAL )<br>INSURANCE COMPANY and PREFERRED )<br>PROFESSIONAL INSURANCE COMPANY, )<br>                                              )<br>    Defendants.                         ) | Case No. _____ |

## COMPLAINT

Plaintiff Margaret A. Mosher, by and through undersigned counsel, for her causes of action against the above-named Defendants, states and alleges as follows:

## PARTIES

1. Plaintiff Margaret A. Mosher is a citizen and resident of Kansas.

2. Defendant the Alaris Group, Inc. (hereinafter "Alaris") is a Minnesota corporation with its principal place of business located at 4108 N. 79th Avenue W., Duluth, Minnesota 55810. Alaris's registered agent for service of process in Kansas is The Corporation Company, Inc., 112 SW 7th Street, Suite 3C, Topeka, Kansas 66603.

3. Defendant Sarah Gerhart (hereinafter "Gerhart") is a citizen and resident of Missouri residing at 1124 Arcadia RD, Chillicothe, Missouri 64601-3559.

4. Defendant Catholic Mutual Insurance Company (hereinafter "Catholic Mutual") is a Nebraska insurance company with its principal place of business located at 10843 Old Mill Road, Omaha, Nebraska 68154-2600. Pursuant to K.S.A. § 60-304(g) and K.S.A. § 40-218, Catholic Mutual may be served with process by serving the Kansas Insurance Commissioner.

5. Defendant Preferred Professional Insurance Company (hereinafter "PPIC") is a Nebraska insurance company with its principal place of business located at 11605 Miracle Hills Drive, Suite 200, Omaha, NE 68154-4467. Pursuant to K.S.A. § 60-304(g) and K.S.A. § 40-218, PPIC may be served with process by serving the Kansas Insurance Commissioner.

6. At all times relevant McAnany, Van Cleave & Phillips, P.A., James P. Appelbaum, M.D. and Eden Wheeler, M.D. were agents and/or employees of Alaris, Catholic Mutual and PPIC.

7. At all times relevant Alaris was employed by and/or an agent of Catholic Mutual and PPIC.

8. At all times relevant Gerhart was an employee and/or agent of Alaris, Catholic Mutual and PPIC.

9. At all times relevant Gerhart was a registered nurse licensed to practice in Kansas and Missouri.

10. All actions and omissions of Alaris, Catholic Mutual and PPIC's employees and agents, actual, apparent or otherwise, as alleged herein, were performed within the scope of their duties as employees and agents of Alaris, Catholic Mutual and PPIC, and Alaris, Catholic Mutual and PPIC are vicariously liable for the acts and omissions of their employees and agents, actual, apparent or otherwise.

11. At all times relevant Plaintiff was employed as Special Director of Education and Assistant Vice Principal at Cure' of Ars Catholic Church.

12. At all times relevant, pursuant to Section 18 of the Kansas Constitution Bill of Rights, Plaintiff had a constitutional right to recover damages from her employer if she was injured during the course and scope of her employment.

## JURISDICTION & VENUE

13. Jurisdiction is proper pursuant to 28 U.S.C. § 1332(a) because this action is between citizens of different states and the amount in controversy is in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs.

14. Venue is proper pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the acts, omissions and illegal conduct giving rise to Plaintiff's claims occurred in Kansas and Defendants are subject to personal jurisdiction in Kansas.

## FACTUAL ALLEGATIONS

15. On August 17, 2014, during the course and scope of her employment with Cure' of Ars Catholic Church, Plaintiff fell at work, struck her head and suffered a concussion and a neck injury.

16. Without the assistance of a lawyer, Plaintiff filed a workers' compensation claim styled <u>Mosher v. Cure' of Ars School and Preferred Professional Insurance Company</u>, Docket No. 1,072,934, with the Kansas Division of Workers Compensation.

17. After receiving notice of Plaintiff's claim, Plaintiff's employer notified its workers' compensation insurance carriers, Catholic Mutual and PPIC.

18. Catholic Mutual and PPIC retained Alaris to assist with the defense of Plaintiff's workers' compensation claim.

19. Alaris is the largest independent workers' compensation case management service in the United States.

20. Alaris's case managers are on "the front lines" of workers' compensation cases and collect injured workers' medical records, attend injured workers' doctor's appointments and work with medical professionals and defense lawyers "toward the goal" of illegally limiting and/or preventing Kansas claimants from receiving workers' compensation benefits they are legally entitled to receive.

21. One of the ways Alaris accomplishes this goal is by forging injured workers' signatures to medical authorizations and sending them to all known medical providers regardless of whether the medical providers have information remotely relevant to the worker's injuries.

22. After fraudulently obtaining injured workers' irrelevant medical records, Alaris digs through the claimant's medical history and private life and distributes this information to workers' compensation physicians and defense lawyers for the purpose of harassing, embarrassing and discouraging claimants from proceeding with their claims and to find any possible reason to limit and/or deny claimants workers' compensation benefits they are legally entitled to receive.

23. Alaris also intentionally misrepresents Kansas workers' compensation law and misleads Kansas citizens about their privacy and legal rights by telling Kansas workers' compensation claimants: "Your written consent is not required for Workers' Compensation Case managers to access information related to your Workers Compensation claim under most states' laws." (Emphasis in original). In a footnote, Alaris cites to K.S.A. § 44-515(d) as support for this false statement. (See documents attached hereto as Exhibit A and incorporated herein by reference).

24. K.S.A. § 44-515(d) states in its entirety:

(d) Except as provided in this section, there shall be no disqualification or privilege preventing the furnishing of reports by or the testimony of any health care provider who actually makes an examination or treats an injured employee, prior to or after an injury.

25. Alaris is not a "health care provider" and K.S.A. § 44-515(d) does not permit Alaris or anyone else to forge a claimant's signature to medical authorizations nor does it allow Alaris to intentionally violate a claimant's privacy and legal rights or to illegally obtain and disclose confidential healthcare information.

26. Notwithstanding Alaris's false and misleading statements about Kansas workers' compensation law, all Defendants knew at all times they were prohibited from collecting and disclosing a claimant's medical records not reasonably related to the worker's injury without the claimant's "authorized consent." (See Documents attached as Exhibit A).

27. On December 2, 2014, Gerhart appeared at Plaintiff's visit with Catholic Mutual and PPIC's workers' compensation physician, Dr. Eric Christensen, and asked her to sign a one-page document on her computer that would allow Gerhart to speak with Dr. Christensen about his examination/treatment of Plaintiff.

28. In response, Plaintiff told Gerhart it was difficult to read the one-page document and that it did not contain Dr. Christensen's name or any other medical provider's name. Gerhart, however, assured Plaintiff the document only allowed Gerhart to speak with Dr. Christensen and did not allow her to speak with or collect medical records from any other healthcare provider. Based on Gerhart's representation, Plaintiff signed the one-page document granting Gerhart permission to speak with Dr. Christensen about his examination/treatment of Plaintiff.

5

29. While Plaintiff and Gerhart were in Dr. Christensen's waiting room, Gerhart told Plaintiff she was required to list all doctors, counselors, psychiatrists and psychologists she had ever seen for any reason and also told her she was required to sign a blank medical authorization that would allow Defendants unlimited access to her medical records and private life regardless of whether a healthcare provider had information relevant to Plaintiff's head/neck injury.

30. When Plaintiff refused to provide Gerhart with a list of all doctors she had ever seen for any reason and refused to sign a blank medical authorization, Gerhart attempted to coerce Plaintiff into signing the authorization by falsely telling Plaintiff that if she did not sign the authorization a judge would order production of all of her medical records. Plaintiff told Gerhart she would address that issue at the appropriate time.

31. Plaintiff never signed any medical authorization allowing Defendants or any of their doctors, lawyers or staff to obtain any of her medical records from any of her healthcare providers. Plaintiff personally obtained medical records related to her injury and treatment and provided them to the Defendants but refused to allow Defendants unlimited access to her entire medical history which necessarily encompassed her private life.

32. On December 3, 2014, Gerhart mailed Plaintiff a letter which states in relevant part:

> Attached you will find the Release of Information form and the Case Management Disclosure Form. I will call or meet with you to go over these forms. Please sign and return the Release of Information form to me in the enclosed envelope. (December 3, 2014 letter attached hereto as Exhibit B and incorporated herein by reference).

33. The next day, December 4, 2014, at 8:52 a.m., Gerhart left a voicemail for Plaintiff which stated:

> Hey, it's Sarah Gerhart. Just calling you to discuss the receipts you gave me. I was going to talk with you – a couple things about that. And I guess **I was going to let you know I'm faxing over a couple signed release forms to your work this morning.** You might look for that within the next hour. **And there's several different ones. St. Luke's requires their own release form to be signed; so I requested that they send that to me. And there's one from St. Luke's specifically, and one from I believe it's Dr. Spurlock's office, and then there will be one from Alaris, which is my company. So sorry about all the multiple forms, but I guess that's what we need to do to get records. Everyone's so particular. So if you have any questions at all feel free to give me a call (660) 247-3882, and I'll put my fax number on there where you can sign those and fax back.** (Transcript of December 4, 2014, 8:52 a.m. voicemail attached as Exhibit C and incorporated herein by reference). (Emphasis added).

34. The following day, December 5, 2014, at 3:39 p.m., Gerhart left another voicemail for Plaintiff which stated:

> Hi, Maggie, it's Sarah Gerhart. Just trying to get ahold of you. **I just wanted to see if you got my release form that you could sign so we could get records for Dr. Wheeler's appointment. And [unintelligible] the St. Luke's one, I believe.** But you're getting ready to go to PT. Sorry to bother you at this time. I hope you have a good weekend and you're doing well. Call me if you need anything, (660-247-3882). (Transcript of December 5, 2014, 3:39 p.m. voicemail attached as Exhibit D and incorporated herein by reference). (Emphasis added).

35. Despite mailing Plaintiff blank medical authorizations on December 3, 2014 and leaving voicemails on December 4 and 5, 2014 asking Plaintiff to sign the authorizations, Gerhart failed to tell Plaintiff that on December 4, 2014, she had printed out Plaintiff's signature from her computer and affixed it to and/or forged Plaintiff's signature to numerous medical authorizations, backdated the authorizations to **December 2, 2014**, and faxed them to an untold number of Plaintiff's healthcare providers including Dr. Daniel Spurlock (Plaintiff's psychiatrist), Dr. Michael Barnthouse

7

(Plaintiff's gynecologist) and Rene McCreary (Plaintiff's rape crisis counselor) allowing Defendants unlimited access to Plaintiff's confidential healthcare information and private life without regard to whether the information was remotely related to the concussion/neck injury she sustained at work. Examples of Defendants' forged medical authorizations are attached as Exhibit A.

36. Rene McCreary received one of Defendants' forged medical authorizations. However, Ms. McCreary is not a medical doctor, psychologist or a healthcare provider. She is a counselor. She works for the Metropolitan Organization to Counter Sexual Assault, which is a rape crisis center in Kansas City. Gerhart had previously asked Plaintiff to sign an authorization allowing Defendants to obtain copies of her rape crisis counseling records but Plaintiff refused and told Gerhart she was not releasing her rape counseling records because they were irrelevant to her concussion/neck injury and because she did not want her employer to have this information.

37. After receiving Defendants' forged medical authorization, Ms. McCreary called Plaintiff and told her to call her doctors and tell them Defendants were circulating forged medical authorizations throughout the Kansas City metropolitan area.

38. Plaintiff followed Ms. McCreary's advice and called Dr. Spurlock's office (Plaintiff's psychiatrist) and spoke with Lori about Defendants' forged authorization. Lori told Plaintiff Dr. Spurlock had not received a medical authorization from Gerhart but said she would put a note in Plaintiff's file not to send any records to her without Plaintiff's consent.

39. However, apparently unbeknownst to Lori, Dr. Spurlock's office had already received Defendants' forged medical authorization but noted it did not contain Plaintiff's correct Social Security Number. In response, Dr. Spurlock's office called Gerhart about the incorrect SSN and also told her Dr. Spurlock required a specific "Medical Records Release Authorization" before his office would release Plaintiff's psychiatric records.

40. On December 4, 2014, Dr. Spurlock's office faxed Gerhart a blank "Medical Record Release Authorization" which Gerhart backdated to December 2, 2014, corrected Plaintiff's SSN, forged Plaintiff's signature to and faxed back to Dr. Spurlock's office.

41. Dr. Spurlock's office then sent Gerhart all of Plaintiff's psychiatric records which contained extremely personal information that was in no way relevant to her concussion/neck injury.

42. After calling Dr. Spurlock's office, Plaintiff called Dr. Barnthouse's office (Plaintiff's gynecologist) and told his assistant about Defendants' forged medical authorization. Dr. Barnthouse's assistant told Plaintiff she had already received a medical authorization from Gerhart and said she thought it was "strange" Gerhart would need Plaintiff's gynecology records to evaluate a workers' compensation claim.

43. Dr. Barnthouse's representative told Plaintiff she had called Gerhart and asked her why she needed Plaintiff's gynecology records. Gerhart told Dr. Barnthouse's representative she had to "have the records" but could not tell her why for "confidential patient reasons." Based on Gerhardt's representations, Dr. Barnthouse sent Defendants all of Plaintiff's gynecology records which included information about

pap smears, breast exams, vaginal exams, her personal life and many other extremely personal matters that were not in any way relevant to her head/neck injury.

44. After receiving Plaintiff's psychiatric and gynecology records (as well as records fraudulently obtained from several other healthcare providers), Defendants sent the records to numerous people including Plaintiff's employer, Dr. James P. Applebaum (Defendants' neurologist), Dr. Eden Wheeler (Defendants' physiatrist) and McAnany Van Cleave & Phillips (Defendants' workers' compensation lawyers).

45. While Plaintiff was treating with Dr. Appelbaum, he accessed on the computer system in his office Plaintiff's gynecology records from Dr. Pritchett (Plaintiff's former gynecologist) and stated "it shows here from Dr. Pritchett that you had a substance abuse problem." Although Dr. Appelbaum was not authorized to access Plaintiff's gynecology records from Dr. Pritchett and had no legitimate reason to do so, Plaintiff told Dr. Appelbaum that information about her having a substance abuse problem was incorrect and there should be a retraction of the statement in Dr. Pritchett's records. Dr. Appelbaum reviewed all of Plaintiff's gynecology records from Dr. Pritchett on his computer and found the retraction letter.

46. Dr. Appelbaum, Dr. Wheeler and McAnany Van Cleave then used Plaintiff's psychiatric records to fabricate a story that Plaintiff was crazy and faking her concussion and neck injury to portray Plaintiff as dishonest and unstable in an attempt to improperly influence the workers' compensation judge and deny Plaintiff reimbursement of past medical expenses she had incurred for treatment of her head/neck injury.

47. The workers' compensation judge issued an order summarizing the psychiatric history provided by Defendants and inferred Plaintiff was not trustworthy but ultimately held that an MRI of Plaintiff's neck provided "objective" evidence of a neck injury and ordered Defendants to reimburse Plaintiff for medical treatment she incurred for her head/neck injury. Although Defendants were unsuccessful in preventing Plaintiff from being reimbursed, Defendants' goal of poisoning the proverbial well and obstructing Plaintiff's legal rights in the workers' compensation proceedings had been achieved.

48. By disclosing Plaintiff's psychiatric records to McAnany Van Cleave, its attorneys and staff, and several doctors including Dr. Applebaum and Dr. Wheeler, Plaintiff's psychiatric history became part of her workers' compensation file which became publicly available information.

49. In Kansas, the proper manner in which to obtain a workers' compensation claimant's medical records is to have the claimant sign a valid medical authorization. If the claimant refuses, the employer may ask a workers' compensation judge to order production of the medical records at issue. If the workers' compensation judge orders production of records the claimant deems irrelevant to her claim, the claimant has an absolute right to appeal any such decision to a district court judge to determine what healthcare information is relevant based on the specific facts and circumstances of the claim.

50. Defendants forged Plaintiff's signature to medical authorizations and collected and disseminated Plaintiff's irrelevant confidential healthcare information to

11

numerous people without Plaintiff's knowledge or consent and used that information to deprive her of her constitutional right to recover work related damages.

51. Defendants fraudulent and illegal conduct also deprived Plaintiff of her legal right to challenge in the workers' compensation proceedings the collection and dissemination of her irrelevant confidential healthcare information.

52. At all times relevant Defendants have had indisputable proof that Gerhart forged Plaintiff's signature to medical authorizations and used the United States Mail and facsimiles to fraudulently collect and disclose her irrelevant confidential healthcare information and then used her illegally obtained psychiatric records to deny her due process in the workers' compensation proceedings.

53. Defendants refuse to report Gerhart to any authority let alone the boards of healing arts in Kansas and Missouri because they approve, sanction and condone fraudulent and illegal conduct by their nurses which in turn warrants, justifies and demands an award to punitive damages to punish Defendants and to send a message to all others who engage in such shameful conduct.

## **COUNT I – FRAUD**

Plaintiff, for Count I of her causes of action against Defendants, states and alleges as follows:

54. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 53 of this Complaint as though fully set forth herein.

55. Defendants provided Plaintiff with the medical authorizations attached as Exhibit A and told Plaintiff they would not obtain or disclose confidential healthcare information not relevant to her workers' compensation claim.

56. Defendants knew their statement was false when they made it.

57. Defendants intentionally forged Plaintiff's name, initials and signature to medical authorizations and collected and disclosed irrelevant confidential healthcare information to numerous people without her knowledge and consent.

58. Defendants concealed their fraudulent conduct from Plaintiff.

59. Defendants knew Plaintiff was not aware of their forgery and fraud and these material facts were vital to Plaintiff's ability to challenge Defendants' illegal collection and dissemination of her confidential healthcare information in the workers' compensation proceedings.

60. Plaintiff lacked knowledge and training in the workers' compensation system and justifiably relied on Defendants to fully disclose all material facts about the collection and dissemination of her confidential healthcare information to enable Plaintiff to challenge and prevent collection and dissemination of her confidential healthcare information in the workers' compensation proceedings.

61. Defendants' conduct in forging Plaintiff's signature to medical authorizations, illegally obtaining and disclosing her irrelevant confidential healthcare information and using that information against her in the workers' compensation proceedings was wanton, intentional, willful, purposeful, malicious and undertaken in conscious disregard for the truth and with complete indifference to the known and probable consequences.

62. If Plaintiff had been apprised of Defendants' fraudulent and illegal conduct, Plaintiff's irrelevant and confidential healthcare information would not have

been obtained or disclosed and extremely personal information about her private life would not have been used against her in the workers' compensation proceedings.

63. All Defendants approved, acquiesced in, sanctioned and ratified Gerhart's fraudulent conduct.

64. As a direct and proximate result of Defendants' fraud, Plaintiff sustained damages.

WHEREFORE, Plaintiff prays for judgment on Count I of her claim against Defendants for a sum in excess of Seventy-Five Thousand Dollars ($75,000.00); for punitive damages that are fair and reasonable and warranted by the evidence; for her costs and expenses in bringing this action; and for such other relief as she may be entitled to by law or as the Court deems just and proper.

## **COUNT II – CIVIL CONSPIRACY**

Plaintiff, for Count II of her causes of action against Defendants, states and alleges as follows:

65. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 64 of this Complaint as though fully set forth herein.

66. At all times relevant Defendants were in engaged in a fraudulent and illegal scheme to limit and/or deny Plaintiff workers' compensation benefits she was legally entitled to receive.

67. Defendants worked together and materially assisted one another to fraudulently and illegally prevent Plaintiff from receiving workers' compensation benefits.

68. There was a meeting of the minds between all Defendants to fraudulently and illegally limit and/or deny Plaintiff workers' compensation benefits.

69. Defendants committed one or more overt acts in furtherance of their civil conspiracy including forging Plaintiff's signature to medical authorizations and collecting and disseminating Plaintiffs' irrelevant confidential healthcare information to numerous people without her knowledge or consent.

70. As a direct and proximate result of Defendants' civil conspiracy and wrongful overt acts in furtherance thereof, Plaintiff sustained injuries and damages.

WHEREFORE, Plaintiff prays for judgment on Count II of her claim against Defendants for a sum in excess of Seventy-Five Thousand Dollars ($75,000.00); for punitive damages that are fair and reasonable and warranted by the evidence; for her costs and expenses in bringing this action; and for such other relief as she may be entitled to by law or as the Court deems just and proper.

### COUNT III – ABUSE OF PROCESS

Plaintiff, for Count III of her causes of action against Defendants, states and alleges as follows:

71. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 70 of this Complaint as though fully set forth herein.

72. When Plaintiff filed her workers' compensation claim she was engaged in a constitutionally protected activity.

73. Defendants' wrongful and illegal conduct as described herein caused Plaintiff an injury sufficient to chill a person of ordinary firmness from continuing to engage in a constitutionally protected activity.

74. Defendants' wrongful and illegal conduct as described herein was substantially based on and directly related to Plaintiff's exercise of a constitutionally protected right.

75. Defendants' wrongful and illegal conduct as described herein was done for the purpose of harassing and/or causing hardship to Plaintiff.

76. Defendants used the Kansas workers' compensation legal process to accomplish a purpose for which it was not designed and are subject to liability for the harm caused thereby.

77. As a direct and proximate result of Defendants' abuse of process, Plaintiff sustained injuries damages.

WHEREFORE, Plaintiff prays for judgment on Count III of her claim against Defendants for a sum in excess of Seventy-Five Thousand Dollars ($75,000.00); for punitive damages that are fair and reasonable and warranted by the evidence; for her costs and expenses in bringing this action; and for such other relief as she may be entitled to by law or as the Court deems just and proper.

## COUNT IV – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Plaintiff, for Count IV of her causes of action against Defendants, states and alleges as follows:

78. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 77 of this Complaint as though fully set forth herein.

79. Defendants' conduct as described herein was intentional.

80. Defendants' conduct as described herein was extreme and outrageous.

81.     There is a direct causal relationship between Defendants' extreme and outrageous conduct and the mental distress Plaintiff suffered as a result.

82.     The mental distress suffered by Plaintiff because of Defendants' extreme and outrageous conduct is so horrendous that the law must intervene because the mental distress inflicted on Plaintiff is so severe that no reasonable person should be expected to endure it.

83.     Defendants' extreme and outrageous conduct went beyond the bounds of decency and is utterly intolerable in a civilized society.

84.     The mental distress Plaintiff suffered because of Defendants' extreme and outrageous conduct has been long lasting and debilitating requiring Plaintiff to seek psychiatric and other medical treatment.

85.     As a direct and proximate result of Defendants' intentional infliction of emotional distress, Plaintiff sustained injuries and damages.

WHEREFORE, Plaintiff prays for judgment on Count IV of her claim against Defendants for a sum in excess of Seventy-Five Thousand Dollars ($75,000.00); for punitive damages that are fair and reasonable and warranted by the evidence; for her costs and expenses in bringing this action; and for such other relief as she may be entitled to by law or as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby requests a trial by jury in the above-captioned case.

HAMILTON LAW FIRM LLC


By:/s/ Patrick A. Hamilton
Patrick A. Hamilton, KS Bar No. 16154
13420 Santa Fe Trail Drive
Lenexa, KS 66215
PHONE: (913) 888-7100
FAX: (913) 888-7388
patrick@lenexalaw.com
ATTORNEY FOR PLAINTIFF